UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JEANETTE VARGAS,                   :

                    Plaintiff,     :

     -against-                     :

PREMIERE STAFF AGENCY, et al.,     :

                    Defendants.    :

----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/18/19

17 Civ. 4280 (VSB)(HBP)

REPORT AND
RECOMMENDATION

PITMAN, United States Magistrate Judge:

     TO THE HONORABLE VERNON S. BRODERICK, United States
District Judge,

I.  Introduction

     By Order dated November 28, 2018, the Honorable Vernon
S. Broderick, United States District Judge, referred this matter
to me to conduct an inquest with respect to corporate defendant
Premier Staff Agency and individual defendant Claudia Nieto-
Premer (collectively, the "Defaulting Defendants") (Order, dated
Nov. 28, 2018 (Docket Item ("D.I.") 68)).  Pursuant to Judge
Broderick's Order, I issued a scheduling Order on December 7,
2018 (D.I. 69).  My Scheduling Order provided, in pertinent part:

          1.  Plaintiff shall submit proposed findings of
     fact and conclusions of law concerning damages no later
     than January 11, 2019.  All factual assertions made by
     plaintiff are to be supported by either affidavit or
     other material of evidentiary weight.

2.   Defendants Premier Staff Agency and Claudia Nieto-Premer shall submit their response to plaintiff's submissions, if any, no later than February 11, 2019. IF PREMIER STAFF AGENCY AND CLAUDIA NIETO-PREMER (1) FAIL TO RESPOND TO PLAINTIFF'S SUBMISSIONS, OR (2) FAIL TO CONTACT MY CHAMBERS BY FEBRUARY 11, 2019 AND REQUEST AN IN-COURT HEARING, IT IS MY INTENTION TO ISSUE A REPORT AND RECOMMENDATION CONCERNING DAMAGES ON THE BASIS OF PLAINTIFF'S WRITTEN SUBMISSIONS ALONE WITHOUT AN IN-COURT HEARING.   See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997); Fustok v. ContiCommodity Services Inc., 873 F.2d 38, 40 (2d Cir. 1989) ("[I]t is not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment.")

Plaintiff timely submitted her Proposed Findings of Fact and Conclusions of Law on January 11, 2019 (Plaintiff's Proposed Findings of Fact and Conclusions of Law, dated Jan. 11, 2019 (D.I. 70) ("Pl. Decl.")).

Copies of both My Scheduling Order and Plaintiff's Proposed Findings of Fact and Conclusions of Law were mailed to the Defaulting Defendants at 325 The Promenade, Edgewater, New Jersey 07020.  To date, Defaulting Defendants have not submitted any materials with respect to this inquest and have not contacted my chambers in anyway.  Accordingly, on the basis of plaintiff's submissions alone, I make the following findings of fact and conclusions of law.

2

II.   Findings of Fact[1]

   A.   The Parties

     1.   Plaintiff Jeanette Vargas is a resident of New York County and a former employee of defendant Café 55, a restaurant located in New York County (Amended Complaint, dated Jan. 16, 2018 (D.I. 26) ("Am. Compl.") ¶ 20; Deposition Testimony of Jeanette Vargas, dated Aug. 23, 2018, annexed to Pl. Decl. as Ex. B (D.I. 70-2) ("Vargas Depo.") at 16-20).

     2.   Defendant Premier Staff Agency is a domestic corporation organized under the laws of the State of New Jersey (Am. Compl. ¶ 22).   Defendant Premier Staff Agency operates, supervises, controls and manages defendant Masterpiece Caterers and defendant Café 55 (Am. Compl. ¶¶ 21-22).

     3.   Defendant Claudia Nieto-Premer is the accounting manager and supervisor of Café 55 (Am. Compl. ¶ 23).

---

[1]As a result of the default, all the allegations of the complaint, except as to the amount of damages, must be taken as true.   Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158-59 (2d Cir. 1992); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 69-70 (2d Cir. 1971), rev'd on other grounds sub nom., Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363 (1973).

Case 1:17-cv-04280-VSB-SLC   Document 77   Filed 07/18/19   Page 4 of 32

B.  Plaintiff's
    Employment with Café 55

4.  Café 55 employed plaintiff as a cashier and food server from July 18, 2016 until November 18, 2016 (Am. Compl. ¶ 26).  Plaintiff worked approximately 40 hours per week (Vargas Depo. at 27-28).[2]  Throughout the entirety of her employment, defendants paid plaintiff $11.00 per hour (Vargas Depo. at 26, 32).

5.  On November 18, 2016, another Café 55 employee named Luis Guzman followed plaintiff into Café 55's employee locker room (Vargas Depo. at 50-51).  Guzman asked plaintiff repeatedly to undress in front of him, and when plaintiff refused, Guzman walked out of the locker room (Vargas Depo. at 51).  Plaintiff then proceeded to change into her work clothes (Vargas Depo. at 52).  As plaintiff was changing, Guzman came back into the locker room and put his hand down plaintiff's pants and groped her vagina and buttocks (Vargas Depo. at 49, 52).  When plaintiff pushed Guzman away, Guzman then grabbed her and forcefully groped her breasts and tried to kiss her (Vargas Depo. at 52-54).  Plaintiff continued to resist Guzman until he eventually left the locker room (Vargas Depo. at 53-55).

---

[2]Plaintiff testified that occasionally she would work more than 40 hours per week if she was called in to cover another employee's shift, but she did not specify what those hours were (Vargas Depo. at 28-29).

4

6.    Plaintiff then went to her work station inside Café 55 and when another employee noticed that plaintiff was crying, plaintiff told him what had happened (Vargas Depo. at 56-58). This co-worker encouraged plaintiff to report what Guzman had done and plaintiff then told her floor manager and Café 55's chef what happened (Vargas Depo. at 58-59).  After plaintiff disclosed what Guzman had done, her floor manager told her that Guzman had previously been caught smelling another female employee's under-wear in the locker room (Vargas Depo. at 65).

7.    Plaintiff informed her floor manager that she wanted to press criminal charges against Guzman, and two police officers were called to Café 55 (Vargas Depo. at 66-67).[3]  Guzman was arrested and, after making a police report, plaintiff left work for the day (Vargas Depo. at 71-72).

8.    Defendant Claudia Nieto-Premer called plaintiff the following day and informed plaintiff that she could not return to work until her criminal case with Guzman was over (Vargas Depo. at 72-73).  Plaintiff expressed concern over missing work because of her financial situation and her young children, but Nieto-Premer told plaintiff that she would not receive a paycheck

---

[3]Guzman was prosecuted by the New York County District Attorney's Office and ultimately found guilty by a jury of Forcible Touching under New York Penal Law Section 130.52[1] (Vargas Depo. at 85-86; Am. Compl. ¶ 85).

because it would be "unfair" for Café 55 to pay plaintiff and not
pay Guzman (Vargas Depo. at 74).

9.   On November 23, 2016, plaintiff went to Café 55 to
pick up her paycheck and again expressed concern to Nieto-Premer
over not being allowed to work (Vargas Depo. at 75).   Nieto-
Premer asked for plaintiff's key to the building and told plain-
tiff that she would ask if there were any available food server
positions at Premiere Staff Agency's other restaurant, India
House (Vargas Depo. at 76-77).   Nieto-Premer found plaintiff an
"as needed" temporary server position, but plaintiff was unable
to accept the position because it did not pay in cash and plain-
tiff needed the money promptly in order to pay a babysitter to
watch her children while she was at work (Vargas Depo. at 77-80).
Plaintiff never spoke with anyone from Café 55 after this conver-
sation and was never advised that she could return to work, even
after Guzman's criminal case had concluded (Vargas Depo. at 80,
93, 95-97, 136-37).

10.   Plaintiff starting receiving unemployment insur-
ance benefits approximately two to three weeks after her employ-
ment ended with Café 55 (Vargas Depo. at 96-97).   Plaintiff also
found a temporary cashier position at a cosmetic store called
Fresh from approximately December 2016 until January 2017 (Vargas
Depo. at 16-17).   Plaintiff worked approximately 30 hours per
week at that position and was paid $17.00 per hour (Vargas Depo.

at 17).  Plaintiff then found a permanent position as a sales
associate for Pandora from approximately February 2017 through
the date of her deposition on August 23, 2018 (Vargas Depo. at
14-15).  Plaintiff worked approximately 20 to 25 hours per week
and was paid between $11.00 and $13.00 per hour at that position
(Vargas Depo. at 14-15).

      11.  Plaintiff visited Ryan Nina Community Health
Center for a counseling session on one occasion Guzman's assault
(Vargas Depo. at 111-13).  Plaintiff further testified that she
feels embarrassed and uncomfortable about what happened to her
and that she has difficulty being in cluttered spaces or riding
the train because she does not want to be close to other people
(Vargas Depo. at 120).  Plaintiff further testified that she
experienced crying spells for four to five months after the
incident and would occasionally have nightmares and difficulty
sleeping (Vargas Depo. at 120).

    C.  <u>Procedural History</u>

      12.  Plaintiff commenced this action against the
defendants on June 7, 2017 alleging violations of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et</u> <u>seq.</u> ("Title
VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296
<u>et</u> <u>seq.</u> ("NYSHRL") and the New York City Human Rights Law, N.Y.C.
Admin. Code §§ 8-107 <u>et</u> <u>seq.</u> ("NYCHRL").  On November 18, 2018,

plaintiff and defendants Masterpiece Caterers, Café 55 and
Marcela Barbieri (collectively, the "Settling Defendants")
reached a confidential settlement agreement.  Defaulting defen-
dants never answered plaintiff's complaint or amended complaint
and have otherwise never appeared in this action.

      13.   The Clerk of the Court issued certificates of
default against Defaulting Defendants on September 7, 2018
(Clerk's Certificate of Default, dated Sept. 7, 2018 (D.I. 44)).
Plaintiff then moved for default judgment against Defaulting
Defendants (D.I. 48).  Judge Broderick ordered that plaintiff
serve her supporting papers on Defaulting Defendants no later
than October 8, 2018 and that Defaulting Defendants respond in
writing to plaintiff's submission no later than 14 days thereaf-
ter (Order, dated Oct. 1, 2018 (D.I. 55)).  Judge Broderick
further ordered that all parties should report for a hearing
before him on November 2, 2018 for him to determine whether a
default judgment should be entered against Defaulting Defendants
(Order, dated Oct. 1, 2018 (D.I. 55)).  This conference was
adjourned at plaintiff's request to November 15, 2018.  Default-
ing Defendants did not respond to plaintiff's motion and did not
appear at the hearing before Judge Broderick on November 15,
2018.  On November 15, 2018, Judge Broderick granted plaintiff's
motion for default judgment (Order, dated Nov. 15, 2018 (D.I.
67)).

III.  Conclusions of Law

14.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because plaintiff alleges a violation of a federal statute -- Title VII.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) with respect to plaintiff's claims under the NYSHRL and the NYCHRL because they are part of the "same case or controversy" as her Title VII claims and arise out of the same facts. 28 U.S.C. § 1367(a).

15.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to plaintiff's claims occurred in this district.

A.  Employment Discrimination
    and Retaliation: Back Pay

16.  Plaintiff contends that she is entitled to $5,300.00 in back pay due to her unlawful termination (Pl. Decl. ¶¶ 55-56).

17.  A plaintiff prevailing under Title VII, the NYSHRL and the NYCHRL is generally entitled to an award of back pay. See Carrero v. N.Y.C. Hous. Auth., 890 F.2d 569, 580 (2d Cir. 1989); Francis v. Ideal Masonry, Inc., 16-CV-2839 (NGG)(PK), 2018 WL 4292171 at *9 (E.D.N.Y. Aug. 3, 2018) (Report & Recommendation), adopted at, 2018 WL 4288625 (E.D.N.Y. Nov. 29, 2018);

Rodriguez v. Express World Wide, LLC, 12 CV 4572 (RJD)(RML), 2014
WL 1347369 at *5 (E.D.N.Y. Jan. 16, 2014) (Report & Recommenda-
tion), adopted at, 2014 WL 1350350 (E.D.N.Y. Mar. 31, 2014).
"Although not automatic, an award of back pay is generally
awarded absent special circumstances." Cavalotti v. Daddyo's
BBQ, Inc., 15 Civ. 6469 (PKC)(VMS), 2018 WL 5456654 at *26
(E.D.N.Y. Sept. 8, 2018), citing Carrero v. N.Y.C. Hous. Auth.,
supra, 890 F.2d at 580 ("[a]n award of back pay is the rule, not
the exception" under Title VII).

18.   "A plaintiff is ordinarily entitled to an award of
back pay from the date of her termination until the date of
judgment." DeCurtis v. Upward Bound Int'l, Inc., 09 Civ. 5378
(RJS), 2011 WL 4549412 at *3 (S.D.N.Y. Sept. 27, 2011) (Sullivan,
D.J., now Cir. J.) (citation and quotation marks omitted); accord
Cavalotti v. Daddyo's BBQ, Inc., supra, 2018 WL 5456654 at *26.
"Where, however, a plaintiff is successful in finding comparable
or better paying employment, as here, back pay ceases to accrue
at the time of such reemployment." Manswell v. Heavenly Miracle
Academy Servs., Inc., 14-CV-7114 (MKB)(SMG), 2017 WL 9487194 at
*15 (E.D.N.Y. Aug. 23, 2017) (Report & Recommendation), adopted
at, 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017); accord Cavalotti
v. Daddyo's BBQ, Inc., supra, 2018 WL 5456654 at *26; Hamza v.
Saks Fifth Ave., Inc., 07 Civ. 5974 (FPS), 2011 WL 6187078 at *4
(S.D.N.Y. Dec. 5, 2011) (Stamp, D.J.).

19.   Plaintiff worked approximately 40 hours per week at Café 55 and was paid $11.00 per hour, or $440.00 per week, at the time of her termination (Vargas Depo. at 26-28, 32; Pl. Decl. ¶ 55).  Plaintiff maintains that she is entitled to $5,300.00 in back wages because it took her 12 weeks to find permanent employment with Pandora (Pl. Decl. ¶¶ 55-56).  It is unclear how plaintiff arrives at this $5,300.00 figure; $440.00 multiplied by 12 is $5,280.00.

20.   Moreover, plaintiff fails to take into account the earnings she made at Fresh during this 12-week period.  From approximately December 2016 through January 2017, plaintiff worked approximately 30 hours per week and was paid $17.00 per hour, or $510.00 per week, for 8 weeks (Vargas Depo. at 16-17). Thus, plaintiff earned $4,080.00 during her 12-week back-pay period, which must be deducted from any back pay award.  See Francis v. Ideal Masonry, Inc., supra, 2018 WL 4292171 at *9 ("new earnings made during the back pay period are deducted from the back pay award"); Becerril v. East Bronx NAACP Child Dev. Ctr., 08 Civ. 10283 (PAC)(KNF), 2009 WL 2611950 at *3 (S.D.N.Y. Aug. 18, 2009) (Fox, M.J.) (Report & Recommendation), adopted at, 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009) (Crotty, D.J.) (same).

21.   Accordingly, I respectfully recommend that plaintiff be awarded $1,200.00 in back-pay ($5,280.00 - $4,080.00 = $1,200.00).

B.   Employment Discrimination
     and Retaliation: Emotional Distress

     22.   In addition to her lost wages, plaintiff also

seeks $260,000.00 in compensatory and emotional damages (Pl.

Decl. ¶ 100).

     23.   "Emotional distress damages are ordinarily recov-

erable in cases where, as here, a plaintiff prevails on employ-

ment discrimination or retaliation claims." Manswell v. Heavenly

Miracle Academy Servs., Inc., supra, 2017 WL 9487194 at *16;

accord Cavalotti v. Daddyo's BBQ, Inc., supra, 2018 WL 5456654 at

*27.   "The Second Circuit sorts emotional distress claims into

three categories of claims:  'garden-variety,' 'significant' or

'egregious.'"  Cavalotti v. Daddyo's BBQ, Inc., supra, 2018 WL

5456654 at *27, quoting Rainone v. Potter, 388 F. Supp. 2d 120,

122 (E.D.N.Y. 2005).   "'Garden variety' emotional distress claims

lacking extraordinary circumstances and without medical corrobo-

ration generally merit $5,000 to $35,000 awards." Munson v.

Diamond, 15 Civ. 425 (DAB)(BCM), 2017 WL 4863096 at *8 (S.D.N.Y.

June 1, 2017) (Moses, M.J.) (internal quotation marks omitted)

(Report & Recommendation), adopted at, 2017 WL 4862789 (S.D.N.Y.

Oct. 26, 2017) (Batts, D.J.); accord Perez v. Jasper Trading,

Inc., 05 CV 1725 (ILG)(VVP), 2007 WL 4441062 at *9 (E.D.N.Y. Dec.

17, 2007) (emotional distress claims in the employment context

where the evidence of emotional distress "consists of plaintiff's

own testimony describing the emotional distress, with little or
no supporting medical evidence" usually warrant awards of $5,000
to $30,000).  "Significant" emotional distress claims typically
involve "substantial harm that is often corroborated by witnesses
or is evidenced by medical documents" and "damages for this type
of claim range from $50,000 to $100,000." Francis v. Ideal
Masonry, Inc., supra, 2018 WL 4292171 at *10.  Finally,
"[e]gregious emotional distress claims justifying awards exceed-
ing $100,000 have only been warranted where the discriminatory
conduct was outrageous and shocking or where the physical health
of plaintiff was significantly affected." Cavalotti v. Daddyo's
BBQ, Inc., supra, 2018 WL 5456654 at *27 (internal quotation
marks and citation omitted).

    24.  Plaintiff testified that she has experienced
lasting feelings of embarrassment, guilt, stress and disgust as a
result of the harassment and assault she suffered on November 18,
2016 (Vargas Depo. at 120).  She also testified that she has
difficulty sleeping, being in cluttered spaces and taking the
train, and that she experiences occasional nightmares (Vargas
Depo. at 120)).

    25.  In further support of her emotional damages claim,
plaintiff submitted affidavits from her fiancé, Nicholas Reyes,
and her friend, Brenda Vasquez (Declaration of Nicholas Reyes,
dated Jan. 10, 2019, annexed to Pl. Decl. as Ex. C (D.I. 70-3)

("Reyes Decl."); Declaration of Brenda Vasquez, dated Jan. 10, 2019, annexed to Pl. Decl. as Ex. D (D.I. 70-4) ("Vasquez Decl.")). Reyes contends that since November 18, 2016, plaintiff has become "depressed, emotionally-withdrawn, less communicative with [him], experienced low self-esteem, lacked self-confidence, had out-of-character outbursts and experienced trouble sleeping" (Reyes Decl. ¶ 12). Similarly, Vasquez maintains that plaintiff has become "anti-social", "depressed", "closed-off" and "dis-trustful" since the assault (Vasquez Decl. ¶ 13).

26. Plaintiff did not submit any evidence of medical treatment other than her own testimony with respect to her one visit to Ryan Nina Community Health Center (Vargas Depo. at 111-13). Plaintiff has not been prescribed and is not taking any medications for her symptoms (Vargas Depo. at 128).

27. Plaintiff's request for $260,000.000 in compensa-tory damages is at the high end of the range of damages for an "egregious" emotional distress claim. Given plaintiff's lack of medical treatment and supporting documentation, the absence of any physical symptoms, the short duration of her employment with defendants and her ability to find comparable employment within a relatively short time after her unlawful termination, I find plaintiff's emotional distress claim to be in the "garden vari-ety" category rather than the "significant" or "egregious" category -- both of which require evidence beyond plaintiff's

14

testimony and subjective complaints of feelings of emotional distress.  See Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38, 41 (2d Cir. 1997) (upholding jury award for $1,145,625.00 in damages for emotional distress under Title VII to discharged plaintiff whose job-related mental health injuries rendered him unemployable); Shea v. Icelandair, 925 F. Supp. 1014, 1022 (S.D.N.Y. 1996) (Francis, M.J.) ($175,000.00 in emotional distress damages where the emotional stress of being demoted and terminated induced the onset of the plaintiff's Parkinson's disease and heart problems).

     28.  Plaintiff cites multiple cases in support of her request for compensatory damages in which juries awarded plaintiffs compensatory damages ranging from $200,000.00 to upwards of $4 million (Pl. Decl. at 16-17).  However, I find these cases to be distinguishable.  In Lee v. City of Syracuse, 446 F. App'x 319, 323 (2d Cir. 2012), an award of $400,000.00 was sustained where the abuse and harassment went on for several years and resulted in physical injuries.  In Olsen v. Cty. of Nassau, 615 F. Supp. 2d 35, 47-49 (E.D.N.Y. 2009), a verdict of $1 million to be divided among three plaintiffs was upheld where all three plaintiffs testified to and presented corroborating medical evidence in the form of records and treating physician testimony demonstrating that each suffered significant distress as a result of defendants' actions, including diagnoses of generalized

anxiety disorder, physical symptoms that mimicked a heart attack, shingles, adjustment disorder, post-traumatic stress symptoms and ongoing psychiatric treatment that included psychotropic medication.  In Khan v. Hip Centralized Laboratory Servs., Inc., CV-03-2411 (DGT), 2008 WL 4283348 at *11-*12 (E.D.N.Y. Sept. 17, 2008), a jury awarded $200,000.00 in compensatory damages in an age discrimination case where plaintiff presented medical evidence demonstrating the effects of his emotional distress, including ongoing mental health treatment, prescription anti-depressant medication and limitations in daily activities; the court remitted the verdict to $50,000.00.  In Osorio v. Source Enterprises, Inc., 05 Civ. 10029 (JSR), 2007 WL 683985 at *5 (S.D.N.Y. Mar. 2, 2007) (Rakoff, D.J.), the court expressed concern over, but ultimately upheld, a jury award of $4 million where plaintiff was discriminated against and ultimately fired from her editor-in-chief position at a prominent entertainment magazine; plaintiff testified to and presented evidence at trial of the emotional harm she suffered, including significant damage to her reputation in the industry and her difficulty in finding another position with the same prestige.[4]

---

[4]Plaintiff also cites to two Southern District cases that do not have any published decisions.  However, based on my review of the ECF entries in these matters, I find them to be distinguishable, as well.  In Mironova v. Pasquale's Damarino's, Inc., 13 Civ. 1663, the jury awarded plaintiff $1.5 million in compensatory damages and $1 million in punitive damages.  In that
(continued...)

29.   Generally, in the default judgment context, courts
have awarded much more modest amounts for compensatory damages in
"garden variety" sexual harassment employment cases where, as
here, plaintiff's injuries largely consisted of feelings of
stress and humiliation, plaintiff's employment with defendants
was relatively short, plaintiff did not seek ongoing mental
health treatment and plaintiff's evidence of injury was
predominantly based on her own testimony.   See Cavalotti v.
Daddyo's BBQ, Inc., supra, 2018 WL 5456654 at *28 ($10,000.00 for
emotional distress damages where plaintiff submitted an affidavit
attesting to her feelings of humiliation and distress after she

---

[4](...continued)
case, plaintiff alleged that she was sexually assaulted by her
direct supervisor multiple times over the course of a year,
including one incident during which defendant ripped off
plaintiff's dress while he masturbated and ejaculated onto her
legs and back, and a second incident in which defendant grabbed
and choked plaintiff, pulled down her and underwear and attempted
to anally rape her (Complaint, dated Mar. 7, 2013 (D.I. 1)).
Defendant also threatened to kill plaintiff multiple times after
these incidents if she told anyone what he had done to her and
used her immigration status to force her to remain at work until
he fired her for resisting his assaults.

In Nurse v. Concepts in Staffing, Inc., 06 Civ. 13500,
plaintiff alleged that she was subjected to nine years of
pervasive racial and sexual harassment, including an incident in
which a co-worker groped her breasts in full view of her
company's vice president (Complaint, dated Nov. 27, 2006 (D.I.
1)).   While plaintiff is correct that a jury awarded Nurse $2.5
million in damages (D.I. 87), the docket sheet reveals that this
judgment was vacated after the parties engaged in post-trial
motion practice and ultimately agreed to settle the case for an
undisclosed amount (D.I.s 121 and 122).

was fired for reporting that a co-worker had been aggressively making sexual advances towards her for approximately two months); Munson v. Diamond, 15 Civ. 0425 (DAB)(BCM), 2017 WL 4863096 at *3-*8 (S.D.N.Y. June 1, 2017) (Moses, M.J.) (Report & Recommendation), adopted at, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017) (Batts, D.J.) ($15,000.00 for emotional distress damages where plaintiff's supervisor repeatedly grabbed her buttocks and made harassing comments for a year, and plaintiff submitted an affidavit in which she attested to feeling "intimidated, abused, anxious, and physically ill", but "fail[ed] to provide any medical records, any corroborating evidence, or any evidence of 'extraordinary circumstances,' as that term is used in Title VII cases" (alterations omitted)); Drice v. My Merchant Servs., LLC, 15 Civ. 0395 (MKB)(MDG), 2016 WL 1266866 at *4 (E.D.N.Y. Mar. 4, 2016) (Report & Recommendation), adopted at, 2016 WL 1266948 (E.D.N.Y. Mar. 31, 2016) ($20,000.00 in emotional distress damages where plaintiff credibly testified that she suffered from severe anxiety and depression, feelings of worthlessness and emotional distress that affected her ability to eat and sleep due to employment sexual harassment, but the duration of her employment was brief and she did not submit any evidence of seeking treatment); Rodriguez v. Express World Wide, LLC, supra, 2014 WL 1347369 at *7 ($10,000.00 in emotional distress damages where plaintiff testified to suffering "severe emotional distress and

physical ailments" as a result of her supervisor making sexual derogatory remarks to her and stroking her hair and shoulder, but did not submit any medical records); Manson v. Friedberg, 08 Civ. 3890 (RO), 2013 WL 2896971 at *6 (S.D.N.Y. June 13, 2013) (Owen, D.J.) ($10,000.00 in emotional distress damages where plaintiff's injuries consisted of feelings of low self-esteem and humiliation after her supervisor stuck his hand down her pants and then fired her when she refused his advances).

30. However, while I find plaintiff's request for $260,000.00 to be extremely excessive, I also note that the severity of plaintiff's allegations takes this case beyond that of a typical employment sexual harassment case. Plaintiff was not merely subjected to inappropriate and disparaging remarks, but was groped against her will in a manner that resulted in a successful criminal prosecution. She was then immediately suspended without pay and effectively terminated for reporting the assault. Furthermore, plaintiff also submitted evidence that defendants were aware of a prior incident involving Guzman in which he was observed smelling another female employee's under-wear. Given the disturbing nature of these facts and the fact that plaintiff provided some corroboration for her emotional distress through the affidavits of Reyes and Vasquez, I find that plaintiff is entitled to the higher end of the range of damages commonly awarded under garden variety emotional distress claims.

19

31.  Accordingly, I respectfully recommend that plaintiff be awarded $30,000.00 in compensatory damages.

C.  The Set-Off Rule

32.  Plaintiff and the Settling Defendants entered into a confidential settlement agreement on November 18, 2018.  This settlement agreement was filed under seal for the court's review and, at the parties request, I shall maintain the confidentiality of the settlement amount.  However, the question still remains whether that settlement amount should be set off against the amounts I have recommended in calculating plaintiff's damages with respect to the Defaulting Defendants.

33.  Generally, "when a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages."  Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989); accord Kotuwage v. NSS Petroleum Inc., 15 Civ. 4374 (FB)(ST), 2018 WL 1189332 at *12 (E.D.N.Y. Feb. 8, 2018) (Report & Recommendation), adopted at, 2018 WL 1187397 (E.D.N.Y. Mar. 7, 2018).  However, "[m]ost courts in the Second Circuit . . . have held that a defendant in default may not invoke the benefits of the set-off rule" because "it is the defendant's burden to demonstrate the

extent to which the recovery against it would be duplicative of the plaintiff's recovery from settling defendants, and by virtue of the defendant's failure to participate in the litigation, it cannot satisfy this burden." <u>Allstate Ins. Co. v. Yehudian</u>, CV 14-4826 (JS)(AKT), 2018 WL 1767873 at *19 (E.D.N.Y. Feb. 15, 2018) (quotation marks and citations omitted) (Report & Recommendation), <u>adopted at</u>, 2018 WL 1686106 (E.D.N.Y. Mar. 31, 2018); <u>accord Gov't Employees Ins. Co. v. Erlikh</u>, 16-CV-7120 (DLI)(SJB), 2019 WL 1487576 at *10 n. 7 (E.D.N.Y. Feb. 28, 2019) ("the burden rests squarely upon [the non-settling defendant] to show the extent to which a recovery against it would be duplicative of the plaintiff's recovery from settling defendants" (quotation marks and citations omitted)); <u>Sole v. Knoedler Gallery, LLC</u>, 12 Civ. 2313 (PGG)(HBP), 2016 WL 5417880 at *10 (S.D.N.Y. July 21, 2016) (Pitman, M.J.) (Report & Recommendation), <u>adopted at</u>, 2016 WL 5468298 (S.D.N.Y. Sept. 28, 2016) (Gardephe, D.J.) ("Courts in the Second Circuit applying federal common law principles have . . . held that the non-settling defendant bears the burden of establishing the extent to which a recovery against it would be duplicative of a plaintiff's recovery from settling defendants, and that a defendant who fails to answer or participate in a damages inquest may not benefit from the set-off rule."); <u>State Farm Mutual Auto. Ins. Co. v. Grafman</u>, 968 F. Supp. 2d 480, 483 (E.D.N.Y. 2013) ("In choosing not to participate in the litiga-

tion, a defaulting party eschews the opportunity to carry this burden, and therefore does not demonstrate its entitlement to, or deserve the benefit of, a set-off."); <u>DeCurtis v. Upward Bound Intern., Inc.</u>, 09 Civ. 5378 (RJS), 2011 WL 4549412 at *9 (S.D.N.Y. Sept. 27, 2011) (Sullivan, D.J., now Cir. J.) (declining to give defaulting defendant the benefit of the set-off rule in a Title VII action); <u>Chloe v. Zarafshan</u>, 06 Civ. 3140 (RJH)(MHD), 2009 WL 2956827 at *7 (S.D.N.Y. Sept. 15, 2009) (Holwell, D.J.) (adopting Report & Recommendation) ("If . . . a party defaults in answering the complaint, courts have held that it may not invoke the benefits of the set-off rule.").[5]

34.  "Although declining to deduct [the] settlement amount from a judgment entered against [Defaulting Defendants]

---

[5]Admittedly, there appears to be a split of authority within the Second Circuit on whether a defaulting defendant may benefit from the set-off rule. <u>See Allstate Ins. Co. v. Yehudian</u>, <u>supra</u>, 2018 WL 1767873 at *18 (discussing this split of authority and collecting cases); <u>see also Allstate Ins. Co. v. Mirvis</u>, CV-08-4405 (SLT)(VVP), 2015 WL 1247103 at *13 (E.D.N.Y. Mar.2, 2015) (Report & Recommendation), <u>adopted at</u>, 2015 WL 1539671 (E.D.N.Y. Mar. 31, 2015) (reducing a RICO default judgment by the amount obtained in settlement without discussion of whether a set-off is proper in the case of a default); <u>Allstate Ins. Co. v. Kumar</u>, 10 Civ. 8166 (KBF)(RLE), 2013 WL 2395748 at *3 (S.D.N.Y. June 3, 2013) (Ellis, M.J.) (Report & Recommendation) (adopted in part in an unpublished order, dated Aug. 12, 2013) ("Defaulting defendants may benefit from the set-off rule."). However, because "most courts in the Second Circuit . . . have held that a defendant in default may <u>not</u> invoke the benefits of the set-off rule", and because set-off is an affirmative defense, <u>see Arch Ins. Co. v. Precision Stone, Inc.</u>, 584 F.3d 33, 42 (2d Cir. 2009), I shall follow the majority. <u>Allstate Ins. Co. v. Yehudian</u>, <u>supra</u>, 2018 WL 1767873 at *19 (quotation marks and citations omitted) (emphasis added).

poses the possibility of a windfall to the plaintiff," courts
have held that this windfall is not a sufficient reason to set
off the amount of the settlement.   Gov't Employees Ins. Co. v.
Simakovsky, 14 Civ. 3775 (KAM)(SMG), 2015 WL 5821407 at *13
(E.D.N.Y. Oct. 5, 2015) (adopting Report & Recommendation);
accord Allstate Ins. Co. v. Yehudian, supra, 2018 WL 1767873 at
*19; see also McDermott, Inc. v. Amclyde, 511 U.S. 202, 219
(1994) (declining to award offset despite possibility of a
windfall to plaintiff because the "law contains no rigid rule
against overcompensation.  Several doctrines . . . recognize that
making tortfeasors pay for the damage they cause can be more
important than preventing overcompensation.").

35.   Thus, I respectfully recommend that the recom-
mended damages from Defaulting Defendants not be offset by the
settlement amount paid by Settling Defendants.

D.   Attorneys' Fees

36.   Unlike a plaintiff's damages, however, courts have
applied the set-off rule to attorneys' fee requests where, as
here, some defendants have entered into a settlement and some
defendants have defaulted.   See Pierre v. Planet Automotive,
Inc., 13-CV-0675 (MKB)(JO), 2018 WL 1385906 at *6 (E.D.N.Y. Feb.
21, 2018) (Report & Recommendation), adopted at, 2018 WL 1385882
(E.D.N.Y. Mar. 19, 2018); Xochimitl v. Pita Grill of Hell's

23

Kitchen, Inc., 14 Civ. 10234 (JGK)(JLC), 2016 WL 4704917 at *21
(S.D.N.Y. Sept. 8, 2016) (Cott, M.J.) (Report & Recommendation),
adopted at, 2016 WL 6879258 (S.D.N.Y. Nov. 21, 2016) (Koeltl,
D.J.); Dixon v. Agbai, 15 Civ. 850 (AT)(AJP), 2016 WL 3702749 at
*18 (S.D.N.Y. July 8, 2016) (Peck, M.J.) (Report & Recommenda-
tion), adopted at, 2016 WL 5660246 (S.D.N.Y. Sept. 28, 2016)
(Torres, D.J.); Colon v. City of New York, 09 Civ. 0008 (JBW),
2012 WL 691544 at *22-*23 (E.D.N.Y. Feb. 9, 2012) (Report &
Recommendation), adopted at, 2012 WL 686878 (E.D.N.Y. Mar. 2,
2012).

37.   Plaintiff was represented in this litigation by
Phillips & Associates, LLP ("P&A").   P&A initially requested
$50,000.00 in attorneys' fees and asserted that lead counsel,
Gregory Calliste, Jr., Esq., spent 125.10 hours litigating the
case (Pl. Decl. ¶ 101; Client Time Report, annexed to Pl. Decl.
as Ex. E (D.I. 70-5) ("Time Records")).[6]   However, upon my
discovery that plaintiff had reached a confidential settlement
with Settling Defendants, I ordered plaintiff to file the written
settlement agreement so I could "properly assess . . . [the]
requested attorneys' fees" (Order, dated Apr. 25, 2019 (D.I.
73)).   With my permission, plaintiff filed this agreement under
seal on May 17, 2019 along with a supplemental inquest submission

---

[6]Plaintiff's counsel states this request includes fees and
costs, but does not identify the costs for which he seeks
reimbursements (Pl. Decl. ¶ 101).

(Plaintiff's Supplemental Submission Regarding Plaintiff's
Pending Motion for Default Against Defendants, dated May 10, 2019
(D.I. 76) ("Pl. Supp.")).

38. It is clear from P&A's time records that the
initially requested 125.10 hours represented work that took place
between January 11, 2017 and November 14, 2018 -- two days after
plaintiff finalized her settlement with the Settling Defendants
(Time Records). It is also clear from my review of the written
settlement agreement that P&A was more than fairly compensated in
attorneys' fees for the "pre-settlement" time period between
January 11, 2017 and November 12, 2018. Thus, P&A's request for
$50,000.00 in fees under this inquest for the same time period is
extremely troubling.

39. To justify the fee request, Mr. Calliste now
attempts to argue that plaintiff's application for a default
judgment was made prior to a final settlement being reached.
While plaintiff's request for a default judgment was made on
September 26, 2018, this request was granted by Judge Broderick
November 15, 2018 and P&A submitted its $50,000.00 fee request to
the undersigned on January 11, 2019 with no mention of any prior
award of attorneys' fees. P&A's time records indicate that the
material terms of the settlement were reached on November 12,
2018 and the Settling Defendants were dismissed from the action
on November 15, 2018 -- almost two months prior to the fee

25

request.   Even more troubling, P&A does not appear to believe its
$50,000.00 fee request should be reduced or offset by the prior
settlement award; rather, Mr. Calliste requests an additional
$9,427.00 in attorneys' fees (Pl. Supp. ¶ 16).  Mr. Calliste
justifies this additional request because (1) his initial request
of $50,000.00 only included the hours he worked on the case and
did not include hours worked by associate, Steve Fingerhut, or
paralegal, Madonna Isaac, and (2) P&A has incurred additional
attorney hours since the initial inquest submission (Pl. Supp. ¶¶
12-16).

40.   Based on my review of the initial time records for
Mr. Calliste and the supplemental time records for Mr. Fingerhut
and Ms. Isaac, I find that all hours spent between January 11,
2017 and November 12, 2018 were spent on the litigation as a
whole and did not exclusively relate to the Defaulting Defendants
(Time Records; Time Records for Madonna Isaac, annexed to Pl.
Supp. as Ex. C (D.I. 76) ("Isaac Time Records"); Time Records for
Steve Fingerhut, annexed to Pl. Supp. as Ex. D (D.I. 76)
("Fingerhut Time Records").  P&A is not entitled to receive
double attorneys' fees, and I respectfully recommend that no
attorneys' fees be awarded for this time period because
plaintiff's prior settlement was inclusive of attorneys' fees and
costs.  See Pierre v. Planet Automotive, Inc., supra, 2018 WL
1385906 at *6 (reducing plaintiff's counsel's lodestar amount

26

from $96,259.56 to $64,559.56 because counsel had already re-
ceived $31,7000.00 in attorneys' fees and costs pursuant to a
prior settlement with non-defaulting defendants); Dixon v. Agbai,
supra, 2016 WL 3702749 at *18 ("the settlement reached with
[settling defendants] was inclusive of attorneys' fees, and
therefore [plaintiff's counsel] has already been compensated for
some aspects of the litigation to the case as a whole").

41.   With respect to P&A's request for attorneys' fees
incurred after November 12, 2018, I shall utilize the "lodestar"
method, i.e., "the product of a reasonable hourly rate and the
reasonable number of hours required by the case," to determine a
presumptively reasonable attorneys' fee award. Millea v. Metro-
North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011); see also Sajvin
v. Singh Farm Corp., 17-CV-4032, 2018 WL 4214335 at *8-*9
(E.D.N.Y. Aug. 13, 2018) (Report & Recommendation), adopted at,
2018 WL 4211300 (E.D.N.Y. Sept. 4, 2018); Reyes v. Lincoln Deli
Grocery Corp., 17 Civ. 2732 (KBF), 2018 WL 2722455 at *8
(S.D.N.Y. June 5, 2018) (Forrest, D.J.).   Under this method,
courts look to "the market rate 'prevailing in the community for
similar services by lawyers of reasonably comparable skill,
experience and reputation.'" Greathouse v. JHS Security, Inc.,
11 Civ. 7845 (PAE)(GWG), 2017 WL 4174811 at *2 (S.D.N.Y. Sept.
20, 2017) (Engelmayer, D.J.), quoting Blum v. Stenson, 465 U.S.
886, 895 n.11 (1984).

1.  Reasonable Hourly Rate

42.   Courts employ the "forum rule," which provides
that courts "should generally use the hourly rates employed in
the district in which the reviewing court sits in calculating the
presumptively reasonable fee." Arbor Hill Concerned Citizens
Neighborhood Ass'n v. County of Alba, 493 F.3d 110, 119 (2d Cir.
2007), amended on other grounds, 522 F.3d 182 (2d Cir. 2008)
(citation and internal quotation marks omitted); see also Blum v.
Stenson, supra, 465 U.S. at 895; Lewis v. American Sugar Refin-
ing, Inc., 14 Civ. 2302 (CRK), 2019 WL 116420 at *2 (S.D.N.Y.
Jan. 2, 2019) (Kelly, J.).

43.   Mr. Calliste has requested an hourly rate of $400
(Pl. Decl. ¶ 107).  Mr. Calliste is a 2003 graduate of New York
Law School and has been practicing law for the past 15 years (Pl.
Decl. ¶ 112-14).  Mr. Calliste specializes in employment, civil
rights and tort litigation and has litigated hundreds of cases,
including at least four cases that were successfully tried and
resulted in multi-million dollar verdicts or settlements (Pl.
Decl. ¶ 108-16).  Mr. Calliste's requested hourly rate appears to
be in line with hourly rates recently awarded to attorneys in
this District with similar qualifications and experience. See
Lewis v. American Sugar Refining, Inc., supra, 2019 WL 116420 at
*3 (awarding a $450 hourly rate to attorney who graduated law

school in 2003 and had been practicing for approximately 15 years in the fields of civil rights, employment discrimination and retaliation); Munoz v. Manhattan Club Timeshare Ass'n, Inc., 11 Civ. 7037 (JPO), 2014 WL 4652481 at *4 (S.D.N.Y. Sept 18, 2014) (Oetken, D.J.) (awarding a $400 hourly rate to "an experienced civil rights attorney with almost twenty years in practice"), aff'd, 607 F. App'x 85 (2d Cir. 2015) (summary order); Spencer v. City of New York, 06 Civ. 2852 (KMW), 2013 WL 6008240 at *45 (S.D.N.Y. Nov. 13, 2013) (Wood, D.J.) (awarding a $400 hourly rate in a civil rights action to attorneys with 10 and 20 years of experience).[7]

44.  Mr. Calliste has requested an hourly rate of $100 for Ms. Isaac (Pl. Supp. ¶ 14).  I also find this requested hourly rate reasonable and in line with other fee awards for paralegals.  Gutierrez v. Taxi Club Mgmt., Inc., 17-cv-532 (AMD)(VMS), 2018 WL 3432786 at *13 (E.D.N.Y. June 25, 2018) (Report & Recommendation), adopted at, 2018 WL 3429903 (E.D.N.Y. July 16, 2018); Ortega v. JR Primos 2 Rest. Corp., 15 Civ. 9183 (JCF), 2017 WL 2634172 at *7 (S.D.N.Y. June 16, 2017) (Francis, M.J.); Quito v. El Pedragal Rest. Corp., 16-cv-6634 (BMC), 2017 WL 2303979 at *2 (E.D.N.Y. May 26, 2017).

---

[7]I note that Mr. Calliste's most recently awarded hourly rate was $250.  Anderson v. County of Suffolk, CV 09-1913 (GRB), 2016 WL 1444594 at *5 (E.D.N.Y. Apr. 11, 2016).  However, given the cases set forth above and the specific facts of this case, I find a $400 hourly rate to be reasonable.

45. Because Mr. Fingerhut only worked on this matter prior to November 12, 2018, I need not determine his reasonable hourly rate (Fingerhut Time Records).

## 2. Reasonable Hours

46. With respect to hours worked after November 12, 2018, Mr. Calliste asserts that he spent 12.9 hours and that Ms. Isaac spent 12.85 hours working on the case (Time Records at 6; Supplemental Calliste Time Records, annexed to Pl. Supp. as Ex. B (D.I. 76) ("Calliste Supp. Records") at 2; Isaac Records at 10-15). Based on my review of these records, at least 2.2 of Mr. Calliste's requested hours and 7.5 of Ms. Isaac's requested hours were spent on matters entirely unrelated to Defaulting Defendants, such as drafting a stipulation of voluntary dismissal for Settling Defendants, addressing issues related to the written settlement agreement and scheduling appointments for plaintiff to receive her settlement checks (Time Records at 6; Calliste Supp. Records at 1; Isaac Records at 10-15). "As this was not time associated with litigating the claims against the [Defaulting Defendants] here, it should not properly be part of any attorneys' fees award." Xochimitl v. Pita Grill of Hell's Kitchen, Inc., supra, 2016 WL 4704917 at *22 (quotation marks and citation omitted).

30

47.   Thus, I respectfully recommend that P&A be awarded $4,280.00 for Mr. Calliste's hours (10.7 hours x $400 = $4,280.00) and $535.00 for Ms. Isaac's hours (5.35 hours x $100 = $535.00), for a total attorneys' fee award of $4,815.00.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-fully recommend that plaintiff be awarded a total of $36,015.00, calculated as follows:  (1) $1,200.00 in back-pay; (2) $30,000.00 in emotional distress damages and (3) $4,815.00 in attorneys' fees.

V.  OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Vernon S. Broderick, United States District Judge, 40 Foley Square, Room 415, New York, New York 10007 and to the Chambers of the undersigned, 500 Pearl Street, Room 1670, New York, New York 10007.  Any requests for an extension of time for filing objec-tions must be directed to Judge Broderick.  FAILURE TO OBJECT

31

WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS
AND **WILL** PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140,
155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d
Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049,
1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.
1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.
1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)
(per curiam).

Dated:  New York, New York
        July 18, 2019

                                    Respectfully submitted,


                                    _____
                                    HENRY PITMAN
                                    United States Magistrate Judge

Copy transmitted to:

Plaintiff's Counsel


Copies mailed to:

Premier Staff Agency
325 The Promenade
Edgewater, New Jersey 07020

Claudia Nieto-Premer
325 The Promenade
Edgewater, New Jersey 07020